

JOHN A. SCIALDONE
Email: jscialdone@frfirm.com

June 3, 2016

American Arbitration Association
Attention: Case Filing Services
1101 Laurel Oak Road, Suite 100
Voorhees, NJ 08043

St. Johns Ship Building, Inc.                Matthew J. Valcourt
Attn: Steven Ganoe & Bobby Barfield          Valcourt and Associates LLC
560 Stokes Landing Road                      850 N.E. Third Street; Suite 208
Palatka, FL 32177                            Dania Beach, FL 33004
sganoe@stjohns-ship.com                      mvalcourt@valcourtlaw.com
bbarfield@stjohns-ship.com

Re:   NOTICE OF DEMAND FOR ARBITRATION
      by Sterling Equipment, Inc. against St. Johns Ship Building, Inc.
      Warranty Claims for Construction of Dump Scow KURT SCHULTE



Gentlemen:

   Please allow this to serve as formal notice of Sterling Equipment, Inc.'s demand for arbitration against St. Johns Ship Building, Inc. pursuant to the parties' October 2, 2013 Barge Construction Contract. The dispute stems from manufacturing and design defects in the dump scow KURT SCHULTE built by St. Johns, and further damages resulting from St. Johns' representation to Sterling that the vessel was complete, ready for delivery, and ready for final payment, when in fact completion and delivery was still not possible for several more months.

   The Contract includes an arbitration provision that adopts the American Arbitration Association Commercial Arbitration Rules. We have enclosed the initial filing fee of $3,500 per the American Arbitration Association's flexible fee schedule. A Demand for Arbitration form is attached as Appendix A.

*Introduction*

   Sterling Equipment contracted with St. Johns Ship Building for the construction of a 267 x 54 split hull dump scow. For reference, dump scows are a type of barge typically used to transport dredge spoil from inland and near coastal dredging locations to offshore disposal sites. The scow is constructed with two hulls that open along the center line. When closed, the hopper can be filled with dredge spoil and towed to the offshore disposal site where the hopper is opened, allowing the spoil to fall to the sea floor. A diesel powered hydraulic system installed on the dump scow controls the opening and closing of the hopper. The agreed construction price

FOWLER RODRIGUEZ • COUNSELORS AT LAW
2505 14TH STREET • SUITE 500 • P.O. BOX 4080 • GULFPORT, MS 39502 • PHONE: (228) 822-9340 • FAX: (228) 822-9343

NEW ORLEANS • GULFPORT • HOUSTON • MIAMI • MOBILE • BOGOTA • CARTAGENA

American Arbitration Association
Attention: Case Filing Services
June 3, 2016
Page 2

was $6,900,000.00 (six million, nine hundred thousand and 00/100 dollars). The agreed adjusted delivery date was July 1, 2014. St. Johns did not complete the scow by that date, and the agreed adjusted delivery date was revised to October 20, 2014.

St. Johns failed to deliver the KURT SCHULTE on October 20th, although it represented to Sterling Equipment the scow had been completed and demanded Sterling pay the balance due for construction. Sterling believed St. Johns and paid the entire balance, and then mobilized equipment to accept delivery. Based on its reasonable expectation that the KURT SCHULTE was on schedule for completion in October 2014 and due to be delivered on October 20th, Sterling relied upon the availability of this dump scow to fulfill a charter. In fact, when Sterling's tug arrived to take delivery of the KURT SCHULTE, it found that St. Johns had deployed a number of small vessels to form a blockade and prevent the scow from departing the shipyard. It was later revealed that the scow's hydraulic system was not properly functioning and that the vessel could not be delivered, and moreover, that St. Johns knew the scow was not ready for delivery. As a result of the failure to deliver, Sterling Equipment lost a charter for the KURT SCHULTE with Great Lakes Dredge & Dock with a minimum value of $900,000.00.

Sterling maintains that a misrepresentation of the completion status of the KURT SCHULTE, combined with the express demand for final payment, amounts to actions which were outside of the contemplated scope of damages that could result from ordinary and reasonable shipyard operations - - essentially amounting to gross negligence or an intentional tort. Therefore, Sterling maintains that the damages resulting from this specific conduct should not be subject to the damage limitations that were agreed to between the parties as part of the anticipated contractual relationship and the anticipated conduct that would be performed by the parties under the contract. Overt and intentional misrepresentation of the completion status of the scow, and utilizing misinformation to obtain funds far in advance of when they would otherwise have been due, was not part of the parties' performance under the contract and, therefore, the damages resulting from this conduct should not be the subject of contractual damage limitations. Likewise, Sterling maintains that had St. Johns provided honest and transparent information about the status of the completion of the vessel, then Sterling could have better prepared to mitigate its damages by seeking another vessel to satisfy its contract with Great Lakes and by having additional capital resources available to the company, as opposed to having tendered those funds to St. Johns without any possibility of receiving a completed vessel at that time.

On the evening of October 20, after failing to deliver the scow as agreed, St. Johns revealed the hydraulic system on the scow was not functioning correctly and that delivery would be postponed. Sterling Equipment later learned that St. Johns had been experiencing problems with the scow's hydraulic system since at least September, but it never told Sterling. The hydraulic system controls the opening and closing of the hopper and allows the KURT SCHULTE to function as a dump scow (i.e. its intended purpose). As of October 20, the hydraulic system was unable to hold pressure for an extended period of time, creating the risk that the hopper could open unexpectedly.

American Arbitration Association
Attention: Case Filing Services
June 3, 2016
Page 3

      After St. Johns missed the adjusted delivery date, Sterling worked diligently with St. Johns and its hydraulic equipment vendor, Supreme Integrated Technology, Inc. ("SIT"), to repair and replace components in the scow's hydraulic system so the dump feature would function properly. The scow was finally completed and delivered on May 28, 2015. After delivery, a number of construction defects were noted throughout the dump scow. The scow sustained damage to its hull bottom plating prior to delivery. Peeling and chipping paint was found in numerous areas throughout the scow, indicating either the surface was not properly prepared, or the paint was not properly applied, or both. Further, the machinery house vents were incorrectly placed such that the machinery house would overheat unless the water tight doors were left open. To avoid such a potentially unsafe situation, the vents had to be relocated and new ventilation installed.

      The KURT SCHULTE (aka Hull No. 55) is the second scow that Sterling had built at St. Johns. The first scow, Hull No. 29, was identical to the KURT SCHULTE in all respects, including the hydraulic system. Hull No. 29 did not experience any issues with the vessel's hydraulic systems, and certainly none to the extent encountered on Hull No. 55. The failure of the hydraulic system and other construction defects found on Hull No. 55 is not the result of a design defect or any action or inaction by Sterling. Rather, St. Johns did not properly install the hydraulic components on Hull No. 55, allowed the hydraulic system to become contaminated, failed to properly prepare the surfaces to be painted, and improperly designed and/or installed the ventilation system.

      A detailed factual background with references to supporting documents and photographs is provided below, followed by a section-by-section review of the Barge Construction Contract. We also provide a detailed description of the late delivery and various construction defects on the KURT SCHULTE, followed by an accounting of the damages Sterling has incurred as a result of St. Johns' breach of the Barge Construction Contract.

*Factual Background*

      On October 2, 2013, Sterling contracted with St. Johns for the construction of a 267 x 54 split hull dump scow to be named the KURT SCHULTE, and referred to as Hull No. 55. A copy of the Barge Construction Contract is attached as Appendix B. Per the contract, the total new construction price was $6,900,000.00, with the scow to be delivered on July 1, 2014. By agreement of the parties, the delivery date was adjusted to October 20, 2014.

      Before the vessel was delivered, St. Johns encountered numerous problems with the scow's hydraulic system and components. Specifically, SIT, St. Johns' vendor for the hydraulic system components, found the scow's entire hydraulic system was contaminated by metal particles. Reportedly, this contamination caused blown hydraulic lines, scoring of the check valves and other hydraulic components, leakage throughout the hydraulic system, and additional damage to the cylinder piston seals and hydraulic pumps. As a result, the hydraulic system would not hold pressure as designed and installed by St. Johns.

American Arbitration Association
Attention: Case Filing Services
June 3, 2016
Page 4

      On October 10, 2014, Custard Insurance Adjusters, acting on behalf of Sterling, surveyed the KURT SCHULTE and reported that other than some minor housekeeping issues, the scow appeared to be ready for delivery. Custard was not told to test the scow's hydraulic system during this survey. Based upon that survey and St. Johns' representation that the scow was complete, including the hydraulic system, Sterling made final payments to St. Johns on October 16, 2014. On October 17, St. Johns sent Sterling a "Protocol of Delivery and Acceptance Form," which Sterling signed and returned on October 20, 2014.

      On October 16, 2014, based on St. Johns' representations that the scow would be delivered on October 20, Sterling Equipment signed a Charter Agreement for the KURT SCHULTE with Great Lakes Dredge & Dock Company. The KURT SCHULTE was to be chartered to Great Lakes between October 20, 2014 and April 19, 2015 (180 days) at the rate of $5,000.00 per day, with the potential for an extension of that term. Because St. Johns failed to deliver the KURT SCHULTE on time, Sterling was not able to provide the dump scow to Great Lakes and lost the charter. A copy of the Sterling/Great Lakes Charter Agreement for the KURT SCHULTE is attached as Appendix C.

      We now know the KURT SCHULTE's hydraulic system was plagued with problems throughout September and October 2014, and that St. Johns knew the scow was not ready for operation on the adjusted delivery date. St. Johns nevertheless demanded and accepted full payment on the vessel and induced Sterling to mobilize a vessel for pickup. On October 20th, Sterling dispatched its tug, the JAY MICHAEL, to take delivery of the KURT SCHULTE. When it arrived, several small boats from the shipyard were placed to block the tow's departure.

      Once it became obvious the KURT SCHULTE could not depart the shipyard, Sterling contacted Joe Ramsey, St. Johns' sales manager, to move the vessels that formed the blockade. Ramsey advised that he needed to confirm with Steve Ganoe, owner of St. Johns, if the barge could actually leave the yard. Later that day, St. Johns dispatched a letter to Sterling stating that a "latent defect" in cylinder No. 4 has become an issue for the dump scow. A copy of the October 20, 2014 letter from St. Johns to Sterling is attached as Appendix D.

      After Sterling received the October 20 letter from St. Johns, Bobby DeCrescenzo with Sterling contacted Kevin Hayes with SIT to determine the extent of the technical issues with the scow's hydraulic system. SIT then shared a September 15 letter to St. Johns detailing the findings on previous inspections of the scow's hydraulic system, and stating that their analysis "suggests that a proper cleaning/pickling of the hydraulic piping and flushing were not completed to any specific grade of cleanliness…[and] that the hydraulic cylinders, which are the lowest possible collection point in the system, are contaminated." SIT had actually inspected the vessel's hydraulic systems on at least three separate occasions, and encountered these types of issues on each. A copy of the September 15, 2014 letter from SIT to St. Johns is attached as Appendix E.

      Within days, based on St. Johns' insistence that the No. 4 hydraulic cylinder was the cause of the issues with the scow's hydraulic system, Sterling sent a replacement cylinder to the

American Arbitration Association
Attention: Case Filing Services
June 3, 2016
Page 5

shipyard to avoid further delay. However, even after the No. 4 cylinder was replaced, the scow's hydraulic system continued to lose pressure over a period of time. Thus, the issue cannot be isolated to a particular cylinder, but rather concerned the entire hydraulic system. See October 31, 2014 letter from Sterling to St. Johns attached as Appendix F.

Once St. Johns acknowledged the scow's hydraulic system was not functioning as designed, St. Johns and SIT set out to determine why the system would not hold pressure and to fix the source of the problem. St. Johns' solution was to add accumulators into the hydraulic system to try and force the system to maintain pressure. To explain, a hydraulic accumulator is a pressure storage reservoir in which hydraulic fluid is held under pressure by compressed gas. With the accumulators installed, the system may hold pressure for a period of time without the hydraulic pump being used, but over time the hydraulic pressure will eventually drop. Moreover, the accumulators installed on the KURT SCHULTE are an extra maintenance item that the scow was not designed with – the same design on Hull No. 29 works fine without accumulators. Therefore, based on Sterling's experience owning and operating marine hydraulic equipment, the accumulators St. Johns added to the KURT SCHULTE did not remedy the source of the hydraulic issues on the scow, but rather served only as a temporary, band-aid repair that would ultimately result in increased maintenance costs.

On February 27, 2015, St. Johns sent a letter to Sterling and SIT arguing that St. Johns had satisfied Sterling's warranty claim. St. Johns also argued that the accumulators provided by SIT and installed on the KURT SCHULTE in an effort for the hydraulic system to hold pressure were an improvement over the original design. However, St. Johns offered no explanation for why the accumulators were not required on Hull No. 29, and yet the hydraulic system on that scow maintains pressure. St. Johns also requested at this time that the KURT SCHULTE be removed from the shipyard. A copy of the February 27, 2015 letter from St. Johns to Sterling and SIT is attached as Appendix G.

On March 3, in response to St. Johns' February 27 letter, Sterling rejected the KURT SCHULTE with the accumulators installed. Sterling noted the design of the hydraulic system on the SCHULTE is identical to the system on Hull No. 29, and the hydraulic system on Hull No. 29 holds pressure without accumulators. So the hydraulic system on the SCHULTE should function without accumulators also. Sterling agreed to test the SCHULTE's hydraulic system without the accumulators, and to take provisional delivery of the scow if it held hydraulic pressure within normal, safe operating ranges. A copy of Sterling Equipment's March 3, 2015 letter to St. Johns is attached as Appendix H.

On May 1, SIT, the vendor who provided hydraulic components for the KURT SCHULTE to St. Johns, made demand on St. Johns for costs and expenses it incurred troubleshooting, repairing, and replacing components as necessary to try and correct the work performed by St. Johns. Unbeknownst to Sterling, on February 25 SIT issued an invoice to St. Johns in the amount of $179,142.68 for costs associated with the efforts to repair the hydraulic system aboard the KURT SCHULTE. A copy of the May 1, 2015 demand letter from SIT to St. Johns with the associated invoices is attached as Appendix I.

American Arbitration Association
Attention: Case Filing Services
June 3, 2016
Page 6

On May 11, after St. Johns continued to refuse to pay SIT, it sent another demand letter again detailing the contamination in the hydraulic system caused by improper installation resulted in the failure of the vessel's hydraulic system. A copy of the May 11, 2015 letter from SIT to St. Johns is attached as Appendix J.

On May 27, St. Johns sent Sterling written notice that the hydraulic system on the KURT SCHULTE was operating normally and capable of holding pressure without the need for accumulators. In that notice letter, St. Johns admitted that the scow was being delivered late, but tried to shift responsibility for the delay in repairs to its hydraulic vendor, SIT. St. Johns plainly stated that "Given the long delays in [SIT] in routing out and completing the repairs pursuant to the warranty, St Johns Ship Building will extend its contracted warranty contained in the build agreement for the barge up to and including April 30, 2016." If the scow was being delivered on schedule, as St. Johns now maintains, why would it extend the warranty period? It wouldn't. A copy of St. Johns' May 27, 2015 written notice to Sterling is attached as Appendix K.

On June 8 and 12, 2015, after the scow was delivered but before it was placed into service, Custard Insurance Adjusters again surveyed the KURT SCHULTE and updated its October 2014 survey. In the June 2015 survey, Custard identified upsets on a bottom longitudinal frame in the port No. 4 compartment, along with a number of areas of burned paint from welding, most likely attributable to repairs to the hydraulic system after the initial inspection in October. The June 15, 2015 survey report from Custard Insurance Adjusters is attached as Appendix L.

On July 31, 2015, Sterling entered into a charter with Boskalis Chile SpA for the KURT SCHULTE. The SCHULTE departed St. Johns shipyard on August 3, 2015 to fulfill Sterling's charter with Boskalis.

After the scow was placed into service, Sterling noted delamination of the tank coatings, particularly around the welded seams. Representatives of PPG Industries, a paint vendor, observed raw mill-scale in some areas and heavy film build-up in others and concluded there was a defect in the surface preparation. Sterling received a quote from May Ship Repair for $340,000.00 (plus materials of $14,500.00) to correct the paint problems. Photos of the delaminating paint are attached as Appendix M. The quote for repairs to the paint and coatings on the scow are attached as Appendix N.

Additional work was required on the scow's hydraulic system. Between October 22 and 28, 2015, SIT sent a hydraulic technician to Chile to make certain repairs to the scow's hydraulic system. In December 2015, due to damages sustained by the contaminated hydraulic system on the scow, SIT re-manufactured the No. 4 cylinder, replacing the spare cylinder Sterling previously sent to the shipyard. Copies of SIT's invoices for these post-delivery hydraulic repairs are attached as Exhibit O.

Other items developed after the scow was put into service. Specifically, the machinery space air vents were incorrectly placed, and new ventilation had to be installed so that the

American Arbitration Association
Attention: Case Filing Services
June 3, 2016
Page 7

watertight doors could remain closed without overheating the area. Also, the wind generator, which is used to charge batteries in the machinery space, was installed significantly lower than recommended by the manufacturer, and was not capable to maintain service to the batteries.

On December 10, 2015, Sterling, through counsel, made demand on St. Johns for $1,912,249.06 in construction issues and warranty items. A copy of that demand is attached as Appendix P. St. Johns has thus far denied Sterling Equipment's claims.

*Overview of Barge Construction Contract*

Pertinent parts of the Sterling Equipment/St. Johns Barge Construction Contract are reproduced and discussed in turn below:

**Article 1.1 Description of Vessel:**

Builder, agrees to construct, test and survey, equip, and complete as designated in the attached Exhibits, free and clear from liens, claims, and encumbrances, one deck barge...which is described on the attached Exhibits "A", "B" (herein referred to as "Specifications"), "C" (collectively referred to as the "Drawings") and "D" Collectively referred to as change orders, which shall be constructed in accordance with the documents referred to in each Exhibit (collectively referred to herein as the "Contract Documents"), all of which have concurrently been identified by the parties hereto and made a part hereof as if fully set forth herein.

This provision requires the Builder to comply with all of the Specifications and Drawings attached to and made part of the Contract. Specific to the scow's hydraulic system, the Contract and Exhibits attached thereto do not include detailed specifications for the hydraulic system. Exhibit B, the Specifications sheet, specifies only that the vessel shall be fitted with four 468-long ton cylinders with six-foot stroke and that the power pack shall be a diesel driven, hydraulic system. The operating range of the scow's hydraulic system is not specified. Nevertheless, SIT consistently noted that the scow's hydraulic system was contaminated, and that this contamination caused the system to lose pressure, rendering the scow unfit for service. Moreover, the design of the SCHULTE's hydraulic system was identical to the hydraulic system on Hull No. 29, which maintained pressure without accumulators. There was no reason for the design of the hydraulic system on the SCHULTE to differ from Hull No. 29 as St. Johns tried to deliver in February 2015.

**Article 1.2 Work to Be Performed**:

The Vessel shall be constructed, surveyed, tested, and delivered in compliance with the applicable laws, rules, regulations, and requirements of the United States Coast Guard and the American Bureau of Shipping ("ABS") or such other regulatory bodies as are set forth in the Contract Documents in force...as of the date of this Contract.

American Arbitration Association
Attention: Case Filing Services
June 3, 2016
Page 8

      The KURT SCHULTE has been classed by the American Bureau of Shipping (ABS) as unlimited all ocean services. Though ABS regulations do not specify operating ranges of hydraulic pressures for dump scows, it is certain that a hydraulic system that is unable to maintain pressure affects the safe operating ability of a dump scow. As of October 20, 2014, when St. Johns tried to deliver the scow, the SCHULTE's hydraulic system was contaminated, causing blown hydraulic lines, scoring of check valves and other hydraulic components, leakage throughout the hydraulic system, and damage to the cylinder piston seals. In this condition, the hydraulic system was unable to hold pressure and, as a result, did not function as a dump scow.

**Article 3.1 Stipulated Delivery Date:**

The Vessel, completed in accordance with the Contract Documents, shall be delivered to Owner, on or before July 1, 2014, the date indicated on the attached Exhibit "A" for the Vessel (hereinafter called the "Stipulated Delivery Date"), or on such date or dates as may be required by reason of agreed changes in the Vessel, or by reason of specified delays resulting from "Force Majeure", as that term is defined in Article 6.

    . . .

In the event that the Vessel is delivered later then the Stipulated Delivery Date plus all additional days allotted for "force majeure", (Stipulated delivery Date plus Change order day additions and "force majeure" days = "Adjusted Delivery Date") then for each day over that "Adjusted Delivery Date" period the vessel is not tendered for delivery, Builder to provide a credit to Owner as follows:

- Late Delivery: $500 per day penalty for each day late past the Stipulated delivery date with the exception of the addition of Permissible Delays as contained in Article 6 for delivery after the Stipulated Delivery date. This penalty amount is for any delivery up to the first 30 days late.
- An additional $1,500 per day penalty for each day late with exception of Permissible Delays as contained in Article 6 for delivery in excess of 30 days past Adjusted Delivery date.

      The Construction Contract originally provided that the dump scow would be ready for delivery on July 1, 2014. The agreed Adjusted Delivery Date was October 20, 2014. As part of the agreement to adjust the delivery date, Sterling agreed to forego recovery of the $500.00 per day penalty with the understanding that the $1,500.00 per day penalty would apply to any further delays. However, the scow was not delivered ready for service until May 27, 2015, after Sterling arranged for SIT to troubleshoot and repair the damaged hydraulic system. This resulted in a late delivery of 215 days. Pursuant to Article 3.1 and the parties' agreement, Sterling Equipment is entitled to late delivery penalties in the amount of $322,500.00 (215 days at $1500.00 per day).

American Arbitration Association
Attention: Case Filing Services
June 3, 2016
Page 9

      **Article 3.3** provides that "Owner shall execute a Delivery and Acceptance Certificate immediately prior to the time of delivery and acceptance of the Vessel by Owner, in the form of Exhibit "D." Sterling Equipment signed a Delivery and Acceptance Certificate around October 17, 2014, before St. Johns blockade on October 20 prevented the JAY MICHAEL from departing with the scow and before receipt of St. Johns' letter that same day explaining there were issues with the scow's hydraulic system. However, St. Johns cannot argue that Certificate prevents Sterling from recovering late delivery penalties in this instance because the scow was not capable of functioning properly due to the contaminated hydraulic system, and St. Johns knew it at that time. That is, St. Johns cannot argue it delivered a fully functioning dump scow in October 2014 because the scow was not capable of functioning as such, and St. Johns knew it.

      Article 5 provides, in pertinent part, that Sterling Equipment's inspections of the scow do not relieve St. Johns of its obligations under the Construction Contract:

> **Article 5. Inspection by Owner's Representative.**
>
> Neither the Owner's Representatives and/or assistants' inspection and/or attendance at any inspection, test or trial, nor the Owner's Representatives' and/or assistants' failure to notify the Builder of any non-conformity shall relieve the Builder from its obligations under this Contract or be deemed to be or construed as a waiver of any objection to, or any acceptance of, faulty design, construction, material and/or workmanship, or any admission that any materials or workmanship are of the standard required for due performance of this Contract.

      Article 5 expressly preserves that no inspection, test, or trial of the scow relieves St. Johns from its obligations to design and construct the scow with suitable materials and in accordance with good workmanship. Here, St. Johns allowed the hydraulic system onboard the KURT SCHULTE to become contaminated, ultimately leading to that system not holding pressure as designed. Moreover, St. Johns knew of these defects when it misrepresented to Sterling Equipment that the scow was ready for delivery. Article 5 preserves Sterling Equipment's claims under these circumstances.

      The warranty owed by St. Johns applies to the other items of repair beyond the hydraulic system. To explain, that system was not repaired, and the scow could not function as designed for its intended purpose, until May 27, 2015. Sterling Equipment submits that the scow was not delivered until that time, and therefore the repair and replacement of the scow's hydraulic system falls outside of St. Johns' warranty obligations.

> **Article 7.1 *General*.** During the Warranty Period, as hereinafter defined, Builder warrants that <u>all labor furnished by Builder hereunder has been performed in a good and workmanlike manner and all materials specified and fabricated by Builder are free from defects. The Builder guarantees the Vessel against any defect(s) in the construction, material and/or workmanship on the part of the Builder or its sub contractors</u> provided such defects are discovered within the

American Arbitration Association
Attention: Case Filing Services
June 3, 2016
Page 10

    Warranty Period after the date of delivery of the Vessel and notice thereof is given in writing to the Builder as soon as reasonably possible after the discovery thereof and latest [thirty (30)] running days after the expiry of the Warranty Period describing the defect(s) so far as reasonably practical. <u>The Builder shall make good, at its own expense, any defect(s) or damage in the Vessel as a direct and immediate consequence of the defect(s) against which the Vessel is guaranteed under this Clause.</u>

  The warranty on materials is limited to those "specified and fabricated <u>by Builder</u>." Further, Builder guarantees the Vessel against "defects…<u>on the part of the Builder or its sub contractors</u>." In St. Johns' October 20, 2014 letter, it specifically noted the hydraulic problem resulted from "a latent defect in Cylinder #4 of the hydraulic system. <u>This was Owner's equipment…</u>" Thus, very early on, St. Johns was aware of the problems with the hydraulic system and tried to pin them on Sterling Equipment in an effort to limit its warranty obligation.

  Finally, the Construction Contract requires that all disputes arising under the Contract be submitted for arbitration. **Article 13.6** of the Barge Construction Contract provides in pertinent part that all claims arising out of or relating to the Contract shall be submitted to, and settled by, an arbitrator in accordance with the current rules of the American Arbitration Association in effect in the state of Florida.

*Damages*

  As noted throughout, Sterling Equipment has incurred several different categories of damages, as a result of St. Johns' breach of the Barge Construction Contract, late delivery of the KURT SCHULTE, and St. Johns' steadfast refusal to honor its warranty obligations.

1.  Late Delivery Penalties.

  Under article 3.1 of the agreement, the stipulated delivery date was July 1, 2014. The delivery date was extended to account for specified delays resulting from Force Majeure and change order day credits. The initial penalty for late delivery was $500.00 per day for the first thirty days, and $1,500.00 per day thereafter. The $500.00 per day penalties were addressed through prior negotiations. Delay penalties of $1,500.00 per day began on October 20, 2014. From October 20, 2014 through May 23, 2015, when SIT advised the hydraulic system met industry standards, a total of 215 days elapsed. At $1,500.00 per day, the late delivery charges for this time period are $322,500.00. While the stipulated delay penalties in the contract allow for late delivery charges, Sterling's actual loss is much higher. The additional damages are mainly the result of its inability to deliver the vessel for a committed charter, losses from its reliance on St. Johns' representation that the vessel was complete and the unnecessary mobilization of a towing vessel and personnel, as well as multiple inspections and tests of equipment after the premature notice of completion was given.

American Arbitration Association
Attention: Case Filing Services
June 3, 2016
Page 11

2. Lost Charter Hire.

Sterling Equipment chartered the KURT SCHULTE to Great Lakes for $5,000.00 per day. The minimum charter period was 180 days, for a minimum charter value of $900,000.00. Likely, the charter would have continued beyond the minimum term. If the initial 180-day charter had begun on October 20, 2014, it would have run through April 18, 2014. The KURT SCHULTE did not actually begin earning charter hire until August 3rd, some 107 days later, when it went on charter to Boskalis Chile SpA at a rate of $4,200.00 per day. Even assuming the original charter to Great Lakes had extended for only half of those 107 days (or if Sterling had been able to secure an alternative charter), then it suffered an additional loss of $265,000.00.

3. Out of Pocket Expenses.

Sterling Equipment also incurred significant out of pocket expenses to assist in troubleshooting the defects in the hydraulic system after the vessel was supposed to be complete. These include two days of time for engineer Gary Rife ($1,119.80), 256 hours of time by Adam Doughty ($12,096.70), travel expenses for Doughty ($9,056.93), and trucking expenses to transport hydraulic cylinders during the repair efforts ($4,900.00). Robert DeCrescenzo made seven trips to Palatka trying to troubleshoot the issues with the SCHULTE. Each involved a minimum of 40 hours, with an overhead impact to Sterling of at least $56,000.00.

Additionally, based on St. Johns' promise that the KURT SCHULTE was ready for delivery, combined with written demand for final payment, and Sterling's good faith tender of same, Sterling's tug Jay Michael arrived at Palatka on October 5, 2014 at 2100 hours expecting to pick up the SCHULTE. Fuel utilized by the Jay Michael en route to St. Johns shipyard was estimated at 1,200 gallons/day at $3.19/gallon totaling $11,484.00. The tug's day rate value for the three-day trip from Miami to Palatka from October 3rd to the 5th adds $15,000.00 in losses to Sterling's account ($5,000.00/day x 3 days). The SCHULTE was not ready; it never was, and in fact, the yard blocked it from leaving. Because the SCHULTE was not ready for delivery, the Jay Michael remained in Palatka standing by until November 1, 2014 at 0700. The standby rate for the Jay Michael is $5,000.00 per day. It was on standby for 26 days and 10 hours, totaling $132,083.33. While standing by, the tug also burned 60 gallons of fuel per day ($4,976.40). Additionally, based on St. Johns' representations on the status of the scow, the JAY MICHAEL did not enter service for a different job so that it could be available to transport the scow.

As detailed above, Sterling Equipment incurred additional damages as a result of the scow's contaminated hydraulic system. First, certain repairs were needed after the scow arrived in Chile ($33,249.90). Second, Sterling incurred costs repairing the damaged No. 4 hydraulic cylinder that was removed from the scow, thus replacing the cylinder that Sterling took out of its inventory to be installed aboard the scow ($36,266.00).

American Arbitration Association
Attention: Case Filing Services
June 3, 2016
Page 12

4.  Hull Plating Damage.

Custard Insurance Adjusters' June 12, 2015 survey identified an upset of the No. 1 bottom longitudinal frame in the port No. 4 compartment, along with a number of areas of burnt paint from welding, most likely attributable to repairs to the hydraulic system after the initial inspection in October. Repair costs are estimated at $48,500.00 as detailed in Bob Birds' June 15, 2015 survey report attached as Appendix L.

5.  Paint Defects.

After delivery, the vessel also began to experience delamination of the tank coatings, particularly around the welded seams. For your ease of reference, photographs of the various paint damage throughout the scow are attached at Appendix M. Representatives from PPG Industries inspected the damage and concluded there was a surface preparation issue because he observed raw mill-scale in some areas and heavy film buildup in others. To get a preliminary indication of damages, Sterling has received a quote from May Ship Repair of $340,000.00 plus materials of $14,500.00.

6.  Miscellaneous.

Other items have developed during the charter to Boskalis. The machinery space air vents were incorrectly placed (when compared to prior deliveries), and new ventilation had to be installed so that the watertight doors could remain closed without overheating the area. Also, the wind generator, which is used to charge batteries in the machinery space, was located significantly lower than what is recommended by the manufacturer, and was not capable of maintaining service to the batteries.

To summarize, Sterling has sustained actual, objective and documented damages in excess of $1.9 million as a result of St. Johns' late delivery of the KURT SCHULTE. An itemized claim summary to recap the above is attached as Appendix Q.

*Appointment of Arbitrator and Conclusion*

The Barge Construction Contract does not provide a method for appointment of the arbitrator. The contract only provides that the arbitration shall take place in Florida. Pursuant to Rule R-12 of the AAA Commercial Arbitration Rules, we ask that the AAA forward a list of ten potential arbitrators from the National Roster for each party to review.

We trust the Demand for Arbitration attached as Appendix A, this supplement, and the other appendices attached hereto satisfy the AAA filing requirements. Please contact the undersigned directly at 228-822-9340 or jscialdone@frfirm.com if we can provide any additional information or materials.

American Arbitration Association
Attention: Case Filing Services
June 3, 2016
Page 13

                                            Best regards,

                                            FOWLER RODRIGUEZ

                                            John A. Scialdone
                                            Todd G. Crawford

JAS/mjt
Enclosures