

Southeast Case Management Center
John Bishop
Vice President
2200 Century Parkway, Suite 300
Atlanta, GA 30345
Telephone: (404)325-0101
Fax: (877)395-1388

January 9, 2018

John Scialdone, Esq.
Scialdone Law Firm, PLLC
2505 14th Street
Suite 500
Gulfport, MS 39501
Via Email to: jscialdone@slfirmus.com

Mathew J. Valcourt, Esq.
Valcourt and Associates, LLC
850 NE 3rd Street
Suite 208
Dania Beach, FL 33004
Via Email to: mvalcourt@valcourtlaw.com

Case Number: 01-16-0002-1463

Sterling Equipment, Inc.
-vs-
St. Johns Ship Building, Inc.

Dear Parties:

By direction of the arbitrator(s) attached please find the duly executed Interim Award in the above matter.

As always, please do not hesitate to contact me if you have any questions.

Sincerely,

//s/ Paris Wilkerson

Paris N Wilkerson
Manager of ADR Services
Direct Dial: (404)320-5133
Email: WilkersonP@adr.org
Fax: (877)395-1388

cc:
David N. Harris, Jr.
Lynn Watson
Stephen Mattesky
Richard A. Volkin
Robert S. Glenn, Jr., Esq.
Frank M. Denton



AMERICAN ARBITRATION ASSOCIATION

Sterling Equipment, Inc.,

    Claimant

v.                                            Case 01-16-0002-1463

St. John's Ship Building, Inc.,

    Respondent

_____

## INTERIM AWARD

    This matter came on for a hearing before the undersigned panel of arbitrators ("the Panel") on November 13th–15th, 2017, in Jacksonville, Florida. Both parties presented live witnesses and various enumerated exhibits which were admitted into evidence. Having heard the witnesses' testimony and having considered the exhibits and the points raised by counsel in both pre-hearing and post-hearing briefs, the Panel now makes the following Interim Award.

### Findings of Fact

1. Claimant, Sterling Equipment, Inc. ("Sterling") is the owner and lessor of various kinds of marine equipment such as tugs and barges.

2. Respondent, St. John's Ship Building Inc. ("St. John's"), is a shipyard located in Jacksonville, Florida, which builds, among other things, various types of barges.

3. On October 2, 2013, Sterling and St. John's entered into a contract for the construction of a dump scow ("the Contract"). A dump scow is a barge commonly used in the dredging industry upon which dredging spoils are loaded. It is then towed out to sea where its split

1

hull opens hydraulically and dumps the spoils into deeper water. This scow was to be named the KURT SCHULTE.

4. St. John's had previously built a dump scow for Sterling called the M.E.R.C. SHEVLIN. That scow has been in use since its delivery without significant operational problems. The two scows were identical except in a few minor, immaterial details.

5. The Contract provided for a delivery date on or before July 1, 2014, at a price of $6,900,000. Section 3.1 of the Contract allowed a credit to Sterling for every day past the delivery date, after adjustment for force majeure days and change order day additions. The credit was $500 per day for the first 30 days and $1500 per day thereafter.

6. Due to various force majeure days and changes which were not before the Panel, the parties adjusted the contractual delivery date to October 20, 2014, and the contract price to $5,815,826.00. (Sterling purchased the steel for the scow separately).

7. Prior to October 20, 2014, most of the contractual preconditions for delivery were met. The scow was documented by the United States Coast Guard; it was classed with the American Bureau of Shipping ("ABS") and it was surveyed by a surveyor representing Sterling who approved it for acceptance. In reliance upon these approvals and in the absence of any knowledge of operational issues with this scow, Sterling paid the remaining sum due for the purchase price on October 17, 2014, and executed a Protocol of Delivery and Acceptance (the "Protocol") on October 20, 2014.

8. Unbeknownst to Sterling, as of the contractual delivery date, there were problems with these scow's hydraulic system which caused a lot of loss of pressure that could result in an opening of the hull and the dumping of spoils prematurely.

9. St. Johns had first been advised of this problem on September 15, 2014, when it received a letter from Supreme Integrated Technologies Inc. ("SITI") the supplier of the four hydraulic cylinders used to open and close the scow's hull. An independent firm, Hydro-Numatics, was retained to investigate the hydraulic issues. St. John's performed its own tests and inspections as well, focused largely on problems with the number four cylinder.

10. On the afternoon of the scheduled delivery date, after the Protocol had been executed by Sterling, St. John's advised Sterling of the problems with the hydraulic system. It also forwarded to Sterling a copy of SITI's letter of September 15, 2014, first advising of these problems.

11. Sterling had stationed a tug at the St. John's yard to take delivery of the scow on October 20, 2014. It was on standby from October 5 through November 5, 2014. It left the yard because the scow was not delivered on the promised date.

12. The repair of the scow's hydraulic system was problematical. Initially, a spare cylinder from the M.E.R.C. SHEVLIN was installed, but it was later replaced by the original number four cylinder, which had been refurbished. In December, accumulators were installed. St. John's invited Sterling to take delivery on December 22, 2014. Sterling declined. After further inspection and flushing of the hydraulic system, SITI certified the scow with the newly installed accumulators to be ready for its intended use on February 15, 2017. At the hearing, Mr. Quinn of St. John's, testified that the scow was ready for delivery (again) on February 27, 2015.

13. Sterling did not take delivery in February either. It only actually took physical possession of the scow in May, after the accumulators had been removed and four new pistons of a different design had been installed.

14. The evidence was clear that the scow could not be used for its commercial purposes as a dump scow on October 20, 2014. The Panel finds that the scow was not delivered to Sterling until February 27, 2015. On this date it was tendered to Sterling with the approval of SITI in compliance with the Contract, as more fully explained below.

## Discussion

The Panel has read and considered the case law cited by able counsel for the parties, particularly the discussions regarding Florida's Uniform Commercial Code ("UCC"). The Panel notes that the Florida UCC does not define "delivery" as it relates to the delivery of goods. At least one Florida court has held that delivery means "delivery as required by the contract...." <u>Starboard Holdings, Ltd. v. ABF Freight Sys.</u>, 235 F. Supp. 3d, 1363, 1368 (S. D. Fla. 2017) (discussing "delivery" by a common carrier). This language is echoed in the contract.

Section 3.1 of the Contract states in part: "the vessel, completed in accordance with the contract documents, shall be delivered to owner, on or before July 1, 2014...." It can be inferred from this language that for a proper delivery to occur, the vessel must be "completed in accordance with the contract documents...." The specifications of the contract did not contain a technical description of the exact pressure the hydraulic system would have to withstand over a given period of time before the system began to bleed down. And the parties agreed at the hearing that there was no industry standard to which to turn for guidance on this issue. The Contract, however, though not specific, is not entirely silent on this issue.

The preamble of the Contract requires St. John's to construct this scow "in accordance with good shipbuilding and marine engineering practice...." Exhibit B to the Contract was the specification sheet for a "5000 CU. YD. SPLIT HULL HYDRAULIC DUMP SCOW." One of

4

the principal operational characteristics of the scow was "remote radio control for dumping and closing mechanism w/dead engine remote dump capability." Exhibit C to the contract was a structural arrangement drawing depicting a "Split Hopper Dump Scow." The Contract clearly contemplated an operational spit-hulled vessel that would function as a dump scow.

Under the warranty section of the Contract, St. John's warranted that it would conduct its work in a "good and workmanlike manner," and that the scow would be free of defects in "all material specified and fabricated" by St. John's. Moreover, St. John's guaranteed the scow "against any defect(s) in the construction, material, and/or workmanship on the part of (St. John's) or its sub contractors...."

St. John's admitted on October 20, 2014, and in its testimony presented at the hearing that there were defects in the scow's hydraulic system and that the split-hulled dump scow which it had built was not yet fit for commercial operation on that date. Delivery did not occur until the KURT SCHULTE was fit for commercial operation.

### Damages

A. <u>Charter hire</u>

Sterling's largest item of damages is its claim for loss of a charter for the scow to Great Lakes Dredge & Dock Co. ("Great Lakes") for use on a dredging project in Miami, Florida. Sterling presented in support of this claim witness testimony from its employees, emails, and an unsigned charter party between Sterling and Great Lakes. The panel does not find this to be sufficient evidence to support Sterling's claim of loss of charter hire. There was insufficient evidence amounting to a fixture of this alleged charter; there was no signed charter; there was no evidence of a deposit paid by Great Lakes; there was inconsistent

5

testimony regarding a starting time for the purported charter; and there was no testimony from any Great Lakes witness that a charter had been fully and legally agreed-upon. It is well-established that this kind of claim for loss of profit cannot be based on speculation. Consequently, the Panel makes no award for loss of charter hire.

A. <u>Delay damages</u>

Pursuant to section 3.1 of The Contract, the Panel awards sterling the sum of **$163,500** for 129 days of delay in delivering the scow. (30 days at $500/day and 99 days at $1500/day).

B. <u>Tug stand-by</u>

It is not entirely clear why the tug JAY MICHAEL arrived at the St. John's yard on October 5, 2015, so far ahead of the anticipated scout delivery date. Nor is it in entirely clear why the tug remained at the yard for more than a week past the anticipated date of delivery. The Panel awards Sterling the sum of **$69,168** as reimbursement for the reasonable cost of mobilizing, five days of standby, demobilizing, and supplying fuel to the tug for a trip from Miami to Palatka and return.

C. <u>Miscellaneous expenses</u>

1. The Panel awards Sterling **$9800** for trucking expenses and for ALG Worldwide Logist.
2. The Panel denies Sterling any costs to correct deficiencies in the barge framing.
3. The Panel denies Sterling any award for repairs made to the hydraulic cylinders while on charter in Chile.
4. The Panel awards Sterling **$36,266** for re-working a spare hydraulic cylinder that was exchanged during construction of the barge.

D. <u>Paint deficiency repairs</u>

Sterling seeks to recover the costs of repainting the scow due to paint delamination in numerous areas of the internal section of the vessel. It appears to the Panel that some of the paint issues complained of must have arisen as a result of the exposure to sea water in Chile, as there were water marks inside the internal compartments of the scow at the time the paint inspection was undertaken. The Panel credits the Tillis report, which estimated repair costs at "between $42,000 and $43,000." Pursuant to Section 7.3 of the Contract, Sterling is awarded 110% of that amount which is **$47,300**.

E. Costs of arbitration

These costs will be assessed as of the date of the final award.

F. Attorneys' fees

The Contract provides that the prevailing party shall be awarded attorney's fees. Sterling is the prevailing party, but the Panel is conscious of the argument that Sterling was not the prevailing party on all issues presented to the Panel. Accordingly, the Panel directs the parties to use their best efforts, in light of this Interim Award, to stipulate to a reasonable sum of attorney's fees to be awarded to Sterling. If the parties are unable to so stipulate, Sterling shall have until January 20, 2018, to submit its claim for attorney's fees and costs, including timesheets and supporting documentation for any claimed out-of-pocket expenses. St. John's shall have five days after the submission by Sterling to respond to Sterling's submission and state any objections it may have. After receiving St. John's response to Sterling's submission, the Panel will issue its final award. The record will be reopened for the limited purpose of addressing attorney's fees.

G. Total interim damage award: **$326,034**.

This 8th day of January, 2018

_____
Frank M. Denton

_____
Richard A. Volkin

_____
Robert S. Glenn, Jr.